VALLEY STREAM FLOORING CORP., Plaintiff, and Columbia Casualty Company, Additional Defendant on Counterclaim,

v.

GREEN MANOR CONSTRUCTION CO., Inc., and Indemnity Insurance Company of North America, Defendants.

Civ. A. No. 59-452.

United States District Court
D. Massachusetts.

June 13, 1963.

Judgment affirmed 336 F.2d 6.

Joseph M. Koufman, Peabody, Koufman & Brewer, Boston, Mass., for plaintiff.

Zipporah B. Wiseman, Mack M. Roberts, James J. Hennessey, J. Burke Sullivan, Boston, Mass., for defendants.

FRANCIS J. W. FORD, District Judge.

This is an action by a subcontractor against the general contractor for a housing contract in which plaintiff seeks to recover from defendant and the surety on its payment bond the value of labor and materials furnished for which it alleges it has not been paid. Defendants counterclaim against plaintiff and the surety on its performance bond for damages for alleged breach of the subcontract by the plaintiff.

On May 20, 1958 defendant Green Manor Construction Co., Inc. (Green Manor) entered into a contract with the Air Force for the construction of 395

housing units for Air Force personnel at Laurence G. Hanscom Field, Bedford, Massachusetts. Some of the buildings were to be single-family units, others were to contain two or four family units. For convenience the project was divided into areas designated Mortgage Areas A, B and C, corresponding to the division of the project for purposes of financing the work. Sometime thereafter negotiations took place regarding the giving of the subcontract for the installation of flooring in these units to Valley Stream Flooring Corporation (Valley Stream) but it does not appear that the contract drawn up was ever executed.

On July 26, 1958 a subcontract for the flooring installation was executed by Green Manor and Valley Stream. This contract called for the installation of Cromar pre-finished flooring in place of the flooring called for by the original specifications for the project. The use of this flooring was approved by the Air Force with a provision that "Any unevenness (Sic) of the floor level will not be tolerated, if the top (Sic) of adjacent boards are not even, the contractor will be compelled to sand the floor levels and refinish it to match the rest of the floor." Cromar flooring was installed in a few units and these floors were rejected by the Air Force because of the unevenness of the floors. On September 13, 1958 a new contract was executed between the parties, providing for the use of the oak and beech flooring called for by the original specifications.

Some 460,000 feet of Cromar lumber had been ordered for use on the project by Valley Stream and had been delivered to the site. Subsequently the Cromar Company recovered judgment against Valley Stream and its surety in an action for the unpaid price of this lumber. In its supplemental complaint Valley Stream seeks to recover from defendants here the damages it was compelled to pay to Cromar, on the ground that the rejection of Cromar floors was caused by the faulty construction of the subflooring and joints by Green Manor.

It is true that physically the cause of the unevenness of the installed Cromar flooring was the unevenness of the sub-flooring and the joists. However, the sub-flooring and joists had been accepted by the Government inspectors, and there is no evidence that they did not fully conform to the specifications of the prime contract. They were satisfactory for the installation of the unfinished oak and maple flooring originally called for by the specifications. Of course, the same unevenness was found in this flooring when installed, but this flooring was intended to be sanded and finished after installation and any irregularities were removed by the sanding so that a satisfactorily even floor resulted. The difficulty with the use of Cromar flooring was that it was not adapted to be used in this particular construction. It is true that the Cromar flooring could have been made acceptable by sanding and refinishing after installation but this would have involved additional expense. The chief reason for using Cromar flooring was, however, to eliminate the work of sanding and finishing after installation, and it was not unreasonable for Green Manor to return to the type of flooring required by the original specifications when the use of Cromar flooring was found to be unsatisfactory. Both parties to the July 26 contract knew that the use of the Cromar flooring was experimental and conditional upon its being found practical to install a floor with Cromar lumber which would meet with Air Force approval. The inability to do so was due to the fact that Cromar was not adapted to use under the conditions found in this project and not to any fault of Green Manor in the installation of the sub-flooring. Any loss suffered by Valley Stream cannot be attributed to any default of Green Manor and hence cannot be charged to defendants.

Plaintiff's claim in its original complaint is based on the contract of September 13, 1958 under which Valley Stream was to install the flooring in the housing units of the project in strict

accordance with the plans, specifications and contract documents for a total price of $137,500. Valley Stream was instructed to begin work on October 1, the work to be completed by December 1. Lumber ordered by Valley Stream began to arrive on October 2 and the laying of the flooring began on the next day. Work was not completed by December 1 but defendants appear to make no contention based on this failure and at least as of December 4 Green Manor wrote to Valley Stream expressing satisfaction with adherence to the schedule up to that date.

In December in the course of sanding operations it was found that cracks had developed in some of the flooring laid by Valley Stream. On December 31 and again on January 5, 1959 flooring in which cracks had appeared was ripped up by order of Green Manor's superintendent, Filloramo, and it was found that the boards had not been nailed according to specifications. The government inspectors refused to accept flooring in which cracks had appeared and Green Manor directed Valley Stream to rip up and relay these floors. Valley Stream took the position that the cracks were caused by conditions for which Green Manor was responsible and that Green Manor should bear the expense of replacing these floors. On January 7, 1959 after several meetings of representatives of the parties to discuss their dispute, Valley Stream pulled its men off the job and later that day sent a letter to Green Manor giving notice of termination of the contract, alleging as grounds for its action failure of Green Manor to pay requisitions when due, ripping up floors without notice to Valley Stream, and ripping up flooring in such manner as to destroy the same and prevent salvage thereof.

Valley Stream contends that it was justified in terminating work under the contract on January 7, 1959 because Green Manor was then in default of its obligations under the contract. Green Manor contends that it was not in default, that Valley Stream defaulted on its obligations under the contract and that Green Manor is entitled to recover damages for the additional expense it suffered in repairing defects chargeable to Green Manor and in completing performance of the contract.

The flooring installed by Valley Stream was in some units oak and in some units beech. The specifications called for the use of No. 1 clear oak or 1st grade beech. Of the beech purchased by Valley Stream and used in this installation 105,000 feet was first grade and 81,000 feet was of the grade described as "second or better" consisting of some boards of first grade and some of second grade. Use of this second grade beech was a violation by Valley Stream of its duty under the contract to install flooring in conformity to the specifications.

The specifications required that flooring be nailed with a nail in every joist. Bidnick, Valley Stream's supervisor at the job site, admitted that some unskilled floor layers were employed. One floor layer employed by Valley Stream testified that he received no instructions as to how to nail the flooring, that he was paid at the rate of eight cents a square foot for flooring he laid, that he nailed the flooring to every second joist and saw other workers nailing in the same way. There was evidence that where flooring installed by Valley Stream was ripped up some boards were nailed on every joist, some on every second joist, some had nails only in random joists, and some boards were not nailed at all. It must be found that Valley Stream breached its contract by a substantial failure to conform to the requirements of the specifications that boards were to be nailed to every joist.

After the flooring had been installed by Valley Stream cracks or separations appeared between the boards from $\frac{1}{8}$ to $\frac{1}{4}$ inch wide. Flooring with cracks was not accepted by Air Force inspectors. In 90 of the 395 units of the project floors with cracks had to be ripped up and relaid. In other units the cracks had to be filled with putty before the work was acceptable. The principal cause of these cracks was the installation of boards with an excessive moisture con-

tent. The flooring as supplied to Valley Stream by the manufacturers was kiln dried to reduce the moisture content. After delivery and before installation these boards absorbed additional moisture and became swollen. After installation the boards dried out in the heated buildings and contracted, thus producing separations between the boards.

The parties differ as to where responsibility lies for the moisture in the boards. At least some of it was clearly the fault of Valley Stream because on at least two days Valley Stream transported the kiln dried flooring taken from railroad cars to the job site in uncovered trucks while it was raining. At the job site Valley Stream unloaded and stored the flooring in the buildings in which it was to be installed. These buildings were still in the process of construction. In many cases doors or windows were not yet put in, or where doors were in place they were left open by workmen of various trades who entered the buildings. Some of the buildings had water in the cellar. In many the heating system was not yet in operation. In some cases painters performed spackling operations involving the use of water in rooms in which flooring was stored.

Valley Stream had the responsibility for protecting the flooring from exposure to excess moisture. Paragraph 11 of the subcontract between the parties provides, so far as relevant here: "11. The Subcontractor shall, at all times, and at his own expense, protect his labor, material, appliances, supplies, tools, plant and equipment against any damage, injury, destruction, theft or loss. In no event shall the Contractor be liable or responsible therefor, notwithstanding such damage, injury, loss, theft or destruction may be caused by, or chargeable to, the fault and negligence of the Contractor; * * *" It is true that under the prime contract between Green Manor (therein called the eligible builder) and the United States there is a provision 5(b) that: "The eligible builder shall protect the materials and work from deterioration and damage during construction and

shall store and secure flammable material from fire, remove oily rags, waste and refuse from buildings each night, and during cold weather furnish all heat necessary for the proper conduct of the work." This makes Green Manor liable to the United States for proper care of the material, but as between Green Manor and Valley Stream the responsibility is governed by their own subcontract, which clearly makes the responsibility that of Valley Stream alone. In fact, the subcontract in Paragraph 1 provides that: "The Subcontractor agrees to assume towards the Contractor, and does hereby assume, for the portion of the project covered by this agreement, all the obligations, duties, conditions, penalties and liabilities assumed by the Contractor towards the Owner under the aforesaid Contract Documents. * * *"

The contract specifications provided in paragraph 5–23 that: "Interior finish, including doors and flooring, shall not be brought into building until plaster is thoroughly dry. Finish may be stored at the site only in weathertight sheds and at the risk of the contractor." Valley Stream, upon whom under the subcontract the responsibility for compliance with these recommendations devolved, failed to comply with these requirements. No watertight shed was provided, and flooring was stored in buildings still open · to the weather in which it was subjected to excessive moisture absorption before installation.

· The principal cause of the separations in the finished flooring which rendered it unacceptable under the contract was the absorption of excessive moisture before installation, and this in turn was due to Valley Stream's default in failing to protect its materials from excessive exposure to moisture during transportation from the freight cars to the job site and during storage on the job site prior to installation.

Plaintiff contends that it was justified in terminating its work under the contract on January 7, 1959 because of alleged defaults on the part of Green Manor. The first of these alleged de-

faults is the failure of Green Manor to make progress payments which Valley Stream contends were due. A requisition for materials supplied to the job for the period from October 25 through November 30 was submitted on December 1, 1958 showing a balance due of $51,165. Filloramo approved payment of only $40,000 which was paid in two installments on December 15 and 16. The subcontract provided as to these payments that: "Ninety per cent (90%) of the work actually completed by the Sub-Contractor in any one month, which shall only include the materials actually and physically incorporated into the project during said period: based upon the written estimate submitted by the Subcontractor on the first day of each month only, if approved by the Contractor's Engineers, the mortgagor, builder, the head of the department, the contracting officer, and the Commissioner, will be paid on the 20th of the following month. * * * It is understood, however, that evidence satisfactory to Green Manor Construction Co., Inc. must be submitted to said Green Manor Construction Co., Inc. by the Subcontractor that any materials delivered at the site have been paid for in full prior to any payments made in accordance with this contract." Green Manor argues that no payment was due until January 20, that is, on the 20th of the month following the month in which the bill was submitted. However, although the provision may possibly be read in this way, the better interpretation seems to be that payment was due on the 20th of the month following the month in which the work was performed, so that payment of the requisition here would be due on December 20. However, there was no evidence that Valley Stream had submitted any evidence to Green Manor that it had paid The Acorn Company for the lumber which had been delivered to Valley Stream, and hence Valley Stream was not entitled to payment of its requisition.

Valley Stream also contends that its termination was justified because of Green Manor's failure to pay weekly payroll requisitions. Payroll requisitions submitted each week from August 26, 1958 through November 5, 1958 were paid. A payment of $2900 was made on the $3500 requisition submitted November 11, 1958. No payment was made on the subsequent requisitions submitted for the following weeks through December 29, 1958. The agreement for payment of weekly payroll requisitions was not part of the subcontract here sued upon but was a collateral agreement set forth in a letter from Green Manor to Valley Stream dated September 13, 1958. This letter contained the provision that: "This procedure shall be followed until completion of the job providing you conform in all respects with the contract * * * " Since, as had been found, Valley Stream had not in several respects conformed to the subcontract, Green Manor was under no duty to continue to pay these weekly payroll requisitions.

Even assuming, however, that Green Manor by failure to pay in full Valley Stream's weekly or monthly requisitions was guilty of a breach of contract which would entitle Valley Stream to terminate the subcontract, Valley Stream could not elect to continue its performance after it had knowledge of the breach, and then at a later time rely on the breach as a ground for termination of the contract. 5 Williston on Contracts, Third Edition, § 688 and cases there cited. This is particularly true where, as here, Valley Stream's purported reliance on defendant's alleged breach comes only after Valley Stream itself is substantially in default and has been called upon to replace work it had not properly performed.

■ Valley Stream also claims justification for its termination because of Green Manor's alleged ripping up of flooring without notice to Valley Stream, and doing so in such manner as to destroy the flooring and prevent salvage thereof. Green Manor had its men begin to rip up flooring on the morning of January 7, before Valley Stream had given notice that it was terminating its work under the subcontract. Green Manor was under a duty to remove and

replace defective flooring if Valley Stream failed to do so. Valley Stream had been called upon to do so and while it may not have categorically refused to do so at the time ripping up of the floors began, it had at least failed to begin that work and had indicated it did not intend to do so except at Green Manor's expense. Green Manor's conduct in starting to rip up defective flooring cannot be held to be unjustified. As to the manner in which Green Manor carried on the work, the only concrete evidence is Bidnick's testimony that some of the flooring ripped up was thrown out of the windows of the buildings to the ground outside. There was no evidence to support a finding that up to the time Valley Stream gave notice it was stopping work on its subcontract, any flooring had been unnecessarily damaged or that Green Manor did not intend to take proper precautions to protect any of the ripped out flooring which may have been salvageable. The conclusion is that Valley Stream's failure to complete the subcontract was not justified by any substantial default on the part of Green Manor.

 Since Valley Stream terminated work under the contract while it was in default and while a substantial amount of the work required by the contract had not been satisfactorily completed because of its default, it is not entitled to recover on its quantum meruit claim. Russo v. Charles I. Hosmer, Inc., 312 Mass. 231, 44 N.E.2d 641.

Defendant on its counterclaim is entitled to recover the reasonable costs which it incurred in excess of the contract price in completing the flooring contract satisfactorily.

Defendant entered into a new subcontract with one Solvold, a flooring contractor, under which Solvold reinstalled flooring in some 90 units where it was defective, finished the installation of flooring in 43 units partially done by Valley Stream and installed flooring in 46 units where Valley Stream had done no work. Solvold's charge for this work, consisting of the costs incurred by him for wages, taxes, materials and union welfare contributions plus a 5% profit was $40,673.42. This charge was fair and reasonable.

Defendant used its own employees to rip out the defective flooring in 90 units and in work such as checking and renailing subflooring damaged in ripping out the finished flooring and in replacing baseboards which had to be removed in replacing defective flooring. It incurred a reasonable cost for labor and materials for this work of $32,198.16. However, it was agreed that $3,692 [1] of this amount was attributable to repair or replacement on flooring installed by Solvold and should be deducted from its claim, leaving a net amount chargeable to Valley Stream of $28,506.16.

Green Manor purchased at least 106,000 feet of flooring needed for use in completing the work under the flooring contract. The reasonable cost of this flooring, chargeable to Valley Stream, was $19,685.63.

Flooring in some of the units had cracks which could be filled in with wood putty to make the work acceptable to government inspectors without ripping out and replacing the flooring. This work was done for Green Manor by Art Floor Finishing Co. Its reasonable charge for this work was $2847.

In the course of ripping out defective flooring some walls, which had been painted after the original flooring installations, were scratched and had to be repainted. Baseboards had to be removed and new baseboards installed after the new floor was laid. This made it necessary to redo the spackle work around the new baseboards and paint them. Replacing of flooring in second floor rooms caused nails to pop in the ceilings of the

---

1. The parties agreed that Green Manor's total claim was to be reduced by $6584 to cover this replacement work not chargeable to Valley Stream. Of this amount $440 was to be a reduction in the heating charges claimed for delay, and $2452 a reduction in the interest charges claimed for delay. The balance of $3,692 is therefore deductible from the amount of Green Manor's charge.

rooms below and it was necessary to re-nail some ceilings, spackle them and re-paint them. This work was done for Green Manor by one Garbutt, a painting contractor. His reasonable charge for this work was $10,000.

Because of the use of second grade beech by Valley Stream in some of the units instead of the first grade called for by the specifications, the government by a construction change order reduced the amount payable to Green Manor under its prime contract by $5,000. This loss is properly chargeable to Valley Stream.

■ Defendant also claims as items of damage certain additional expenses allegedly incurred because of delay in completing the project as a result of Valley Stream's default. These include an overhead cost for executive and office payroll and supervisory and engineering expense of $18,577.64, interest charges of $28,-648.80 which Green Manor had to pay during the period before final acceptance of the project by the Air Force, and additional expense in the amount of $15,229.-21 for heating the units during the period of delay.

These figures are based on a claimed delay of eight weeks in completing the work attributable to Valley Stream's default. The buildings in Mortgage Area A were accepted and turned over to the Air Force on March 24, 1959; those in Area B on April 3, 1959; and those in Area C on June 4, 1959. The evidence as to the extent of delay is the testimony of defendant's superintendent Filloramo. He testified that if it had not been for difficulties with the flooring, work on Area A would have been completed on January 7, 1959, on Area B on January 21, 1959, and work on Area C on May 1, 1959. Defendant admits that it also had difficulties about this time with the painting done on the units and had to replace its painting subcontractor, and that some delay was due to this cause. However, Filloramo testified that the delay attributable to difficulties with the flooring was eight weeks for Area A, six weeks for Area B and four weeks for Area C.

The difficulty with this evidence of delay is that it amounts only to an opinion of Filloramo unsupported by any facts in evidence. The testimony as to when the work would have been finished but for the difficulties which arose is only Filloramo's opinion based on his observations as to the rate at which the work was progressing. Facts in evidence tend to contradict this estimate. On January 7, when the work on Area A supposedly would have been completed, there remained about 60 units to be painted. The diaries of Callahan, an inspector on the project, contain his notations on the work being carried on each day in various parts of the project. On various dates up to January 23 there are notations that all efforts are being applied to finishing Area A. On various dates in January there are references to work being done in Area A by carpenters, painters, plumbers, electricians, brick-layers, sheet metal workers, and other tradesmen. On January 29 he noted: "All mechanics are working in buildings in Mortgage A Area." There are similar notations as to inspections of buildings in Area A through January and February and into March. Specifically, as late as February 13 inspections were still being made in Area A of buildings in which flooring did not have to be ripped up. The diaries indicate that it was only toward the end of January that work of the various crafts began to shift from Area A to Area B, and as late as March 4 cement finishers, pipe coverers, electricians, Venetian blind installers and other mechanics were still at work in Area B. In Area C there were similar entries for work being done by carpenters and painters to correct deficiencies until late in May. In the light of these facts Filloramo's estimates as to the dates when the work would have been finished except for defective flooring cannot be accepted as having even an approximate value.

So also, it is conceded by defendant that there was delay due to deficiencies in the painting work. There is, however, no evidence as to what these deficiencies

were, how long it would take to correct them, or when they actually were corrected. There is no evidence whatsoever of facts upon which the court could base any conclusion as to how much delay was caused by painting deficiencies, but only an arbitrary determination by Filloramo that eight weeks delay is to be charged to flooring deficiencies and the rest to the painters.

On this evidence it cannot be found that defendant has sustained its burden of showing with any reasonable degree of probability what delay, if any, was caused by Valley Stream's default. The extent of the delay or even whether any delay at all in actual completion of the work resulted from flooring deficiencies is thus left a matter of speculation. The claims for damages based on delay cannot therefore be allowed.

■ Defendant also claims as an item of damages $846 paid to a photographer for pictures showing the condition of the flooring. This item cannot be allowed. It appears to be an expense incurred for Green Manor's own benefit in recording evidence to support its claim against Valley Stream rather than an expense necessary to completion of the flooring subcontract.

The total of these items of damage is $106,712.21. In addition, Green Manor had paid Valley Stream a total of $73,500 in partial payments during the progress of the work. The total reasonable cost to Green Manor for completing the flooring installation was therefore $180,212.21. The difference between this cost and the original contract price of $137,500 is $42,712.21. Valley Stream is also entitled to a credit of $750, the value of flooring ripped out by Green Manor and used by Solvold on another installation he was performing for Green Manor. At least 15,000 feet of such flooring having a fair value of $50 per thousand feet was salvaged and re-used. The net amount of the damages recoverable by Green Manor is $41,862.21.

Columbia Casualty Company as defendant on the counterclaim argues it cannot be held liable since the only bond introduced in evidence was one on which it was surety for plaintiff Valley Stream in connection with its contract of July 26, 1958 and no evidence was introduced to show Columbia executed any bond in connection with the September 13, 1958 contract. However, the allegations of paragraphs 4 and 5 of the counterclaim, alleging execution of performance bonds in connection with the September 13 contract were admitted by Columbia's answer to the counterclaim.

On plaintiff's complaint and supplemental complaint judgment will be entered for defendants. On the counterclaim judgment will be entered for defendant Green Manor Construction Co., Inc. against Valley Stream Flooring Corp. and Columbia Casualty Company for damages in the amount of $41,862.21.